Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Andrea Soliz (SBN 243302) *as@mckennonlawgroup.com*
**MCKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-387-9595 | Fax: 949-385-5165

Attorneys for Plaintiffs Zachary Wallace, Clayton Wallace and Liza Wallace

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| ZACHARY WALLACE; CLAYTON WALLACE; and LIZA WALLACE,<br><br>            Plaintiffs,<br>vs.<br><br>AETNA LIFE INSURANCE COMPANY; SHI INTERNATIONAL CORP.; and DOES 1 through 10, inclusive,<br><br>            Defendant. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PREJUDGMENT INTEREST; AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br>- Civil Cover Sheet;<br>- Certification of Interested Entities or Persons; and<br>- Summons] |

Case No.:

# INTRODUCTION

1. In this lawsuit, Plaintiffs Zachary Wallace ("Zachary"), Clayton Wallace and Liza Wallace (collectively, "Plaintiffs") seek to recover payment for health insurance benefits that were wrongfully denied by Defendant Aetna Life Insurance Company ("Aetna"). Plaintiffs Clayton Wallace and Liza Wallace are the parents of Zachary. The disputed health insurance claims relate to medically necessary substance-abuse treatment received by Zachary from December 2018 through May 2020. Aetna issued and administered the health benefit plan, Contract No. MSA-308616 (the "Plan"), and Defendant SHI International Corp. ("SHI") funded the Plan. SHI is the employer of Plaintiff Clayton Wallace, and all three Plaintiffs are insured under the Plan. The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). After being presented with valid health insurance claims for Zachary's medical treatment, Aetna improperly refused to pay the claims to the fullest extent permitted under the Plan, instead choosing to arbitrarily reduce payment for certain claims and denying other claims altogether. Further compounding its bad faith, Aetna failed to afford Plaintiffs a full and fair review of their claims as required by ERISA because it failed to provide Plaintiffs with written notice of the adverse benefit determination for the vast majority of the claim denials. As discussed herein, throughout the entire administrative process, Aetna engaged in an arbitrary and biased handling of Plaintiffs' claims. As a result of Aetna's improper claims-handling practices, Plaintiffs were left with nearly $200,000 in unpaid medical bills for medical services that should have been covered under the Plan.

# JURISDICTION AND VENUE

2. Plaintiffs bring this action to recover benefits and to enforce and clarify their rights under Section 502(a)(1)(B) of ERISA, 29 U.S.C. Section 1132(a)(1)(B). This Court has subject-matter jurisdiction over Plaintiffs' claims pursuant to ERISA

1

1  Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section
2  1331.
3      3.      Venue lies in the Northern District of California, San Francisco
4  Division pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2),
5  because some of the Plaintiffs reside in this district, some of the alleged breaches
6  occurred in this district and the ERISA-governed plan at issue was administered in
7  part in this district.

## PARTIES

    4.      Plaintiffs were, at all times relevant to this action, residents of Windsor, California. Further, at all times relevant to this action, Plaintiffs were participants and beneficiaries, as defined by Section 3(7) of ERISA, 29 U.S.C. Section 1002(7), in the employee welfare benefit plan established by SHI, which is at issue in this action.

    5.      Aetna, at all times relevant, administered health insurance benefits to SHI employees and their eligible dependents, including Plaintiffs, by issuing the Plan to SHI. Aetna is, and at all times relevant was, an ERISA claims fiduciary of the Plan. Aetna administered the Plan's benefits and determined whether benefits would be awarded or denied under the Plan.

    6.      SHI employed Plaintiff Clayton Wallace, through which the Plan's benefits became available to Plaintiffs as it did to all employees and their dependents eligible under the employer-sponsored Plan. SHI is, and at all times relevant was, an ERISA plan fiduciary. SHI administered and funded the benefits under the Plan as offered to its employees and their eligible dependents. SHI also acted as Aetna's agent concerning its employees' enrollment in the Plan and the collection of premiums for such benefits as that provided by the Plan.

    7.      Defendants Does 1 through 10, inclusive, are sued by fictitious names because their true name and capacities, whether individual, corporate, associate or otherwise, and/or their responsibility and culpability for the acts alleged herein, are

2

1 unknown to Plaintiffs at this time.  Plaintiffs are informed and believe, and on that
2 basis allege, that each Defendant sued herein as "Doe" is responsible in some
3 manner for the acts and events referred to herein.  When the true name, capacity,
4 responsibility and culpability of each Doe Defendant are ascertained, Plaintiffs will
5 seek leave of this Court to amend the complaint, as appropriate.

6       8. Plaintiffs are informed and believe, and on that basis allege, that, at all
7 times mentioned herein, each of the fictitiously named defendants was the agent,
8 representative, co-conspirator, successor-in-interest, assignee or employee of each
9 remaining defendant, and in doing the things alleged herein was acting within the
10 course and scope of such agency, representation, conspiracy, assignment or
11 employment.

## GENERAL ALLEGATIONS

13       9. As part of Plaintiff Clayton Wallace's employment with SHI, he
14 obtained health insurance coverage under the Plan for himself and his dependents,
15 including his wife, Plaintiff Liza Wallace and his son, Zachary.  According to the
16 Plan, substance-abuse-related treatment is a covered health item.  The Plan provides:

> Eligible health services include the treatment of substance abuse provided by a hospital, psychiatric hospital, residential treatment facility, physician or behavioral health provider as follows:
>
> - Inpatient room and board at the semi-private room rate, and other services and supplies that are provided during your stay in a hospital, psychiatric hospital or residential treatment facility . . .
> - Outpatient treatment received while not confined as an inpatient in a hospital, psychiatric hospital or residential treatment facility, including:
>   - Office visits to a physician or behavioral health provider such as a psychiatrist, psychologist, social worker, advance practice registered nurse, or licensed professional counselor . . .
>   - Individual, group and family therapies for the treatment of substance abuse
>   - Other outpatient substance abuse treatment such as:
>     - Outpatient detoxification

3

- Partial hospitalization treatment provided in a facility or program for the treatment of substance abuse provided under the direction of a physician
- Intensive outpatient program provided in a facility or program for the treatment of substance abuse provided under the direction of a physician
- Ambulatory detoxification which are outpatient services that monitor withdrawal from alcohol and other substance abuse, including the administration of medications

The Plan defines "Substance Abuse" in relevant part as follows:

> This is a physical or psychological dependency, or both, on a controlled substance or alcohol agent. These are defined in the Diagnostic and Statistical Manual of Mental Disorders (DSM) published by the American Psychiatric Association.

The Plan defines "Medically necessary/medical necessity" as follows:

> Health care services that we determine a provider exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that we determine are:
> - In accordance with generally accepted standards of medical practice.
> - Clinically appropriate in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease.
> - Not primarily for the convenience of the patient, physician, or other health care provider.
> - Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

Pursuant to the Plan, out-of-network substance-related disorders treatment is covered at 60% of the recognized charge per admission for inpatient treatment and 60% of the recognized charge per visit for outpatient treatment, both with no deductible applied.

  10. Zachary has an extensive history of substance-abuse treatment dating back to December 2018. On December 12, 2018, Zachary entered his first inpatient

treatment facility at Cirque Lodge in Sundance, Utah. He had suffered a heroin overdose the previous month and, with the encouragement of his family, had decided to seek professional help for his substance abuse problem. However, after only six weeks he was asked to leave the facility due to non-compliance and aggressive behavior with peers and staff. He was discharged from Cirque Lodge on January 27, 2019 and was then escorted directly to his second treatment facility, Caron Pennsylvania Treatment Center ("Caron Pennsylvania"). He began inpatient substance-abuse treatment at Caron Pennsylvania on January 28, 2019. After only two weeks at this facility, he was asked to transfer to another facility because he had, again, become verbally abusive to staff members and non-compliant with facility rules. He was discharged from Caron Pennsylvania on February 11, 2019 and was then admitted to Boca Detox where he remained until February 17, 2019. On February 18, 2019, he transferred to Caron of Florida Treatment Center ("Caron Florida") for further inpatient substance-abuse treatment. He remained at Caron Florida for over four months until June 25, 2019, when he was discharged to a halfway house. Unfortunately, he was unable to continuously maintain his sobriety, and he spent the next several months moving around to different halfway houses and detoxification centers in Florida.

11. This lasted until January 29, 2020, when Zachary suffered a *life-threatening overdose* at Legacy Healing Detox Center. He was immediately rushed to the emergency room at Broward Health Imperial Point Hospital after being administered two doses of Narcan (a prescription medication used to treat narcotic overdose in an emergency situation) inside the detox facility. He was admitted with acute hypoxemic respiratory failure secondary to heroin overdose. Zachary remained in the Intensive Care Unit, on life-support, for one week while he slowly recovered from his overdose. On February 4, 2020, Zachary was discharged from Broward Health Imperial Point Hospital. Two days later he entered another detoxification facility, Immersion Residential, prior to enrolling in his last inpatient

5

residential substance-abuse treatment center, Voyage Recovery, where he finally became sober. He was admitted to Voyage Recovery on February 10, 2020 and was discharged on May 11, 2020.

12. As summarized above, between December 2018 and May 2020, Zachary was treated at several different inpatient substance-abuse treatment centers and continued to undergo medically necessary substance-abuse treatment during this time. The medical records related to his treatment at these facilities reveal that he was diagnosed with the following: Opioid Use Disorder; Sedative Use Disorder; Sedative, Hypnotic and Anxiolytic Use Disorder; and Other Unspecified Trauma and Stressor-Related Disorder. During his time in treatment, Zachary was evaluated by various psychologists, nurse case managers and behavioral health therapists, all of whom confirmed Zachary's serious substance abuse and mental-health-related diagnoses and reiterated the need for further residential substance-abuse treatment.

13. For instance, a Nursing Assessment conducted on January 28, 2019 at Caron Pennsylvania confirmed that Zachary presented for severe opioid use disorder and severe sedative use disorder. This included daily heroin and fentanyl use. The assessment reflected that Zachary met eleven out of eleven of the diagnostic criteria for severe opioid use disorder including, but not limited to, (1) opioids often taken in larger amounts or over a longer period of time than was intended; (2) a great deal of time is spent in activities necessary to obtain opioid, use opioid or recover from its effects; (3) recurrent opioid use resulting in a failure to fulfill major role obligations at work, school or home; (4) continued opioid use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of opioid; and (5) recurrent opioid use in situations in which it is physically hazardous. This assessment was confirmed by the treatment center's Senior Director of Psychological Services, Dr. Michele Pole, PhD, who officially diagnosed Zachary with "Severe Opioid Use Disorder, Severe Sedative Use Disorder and Other Unspecified Trauma and Stressor Related Disorder." In addition, behavioral health

therapist Bethany Koch agreed that the American Psychological Association's Diagnostic and Statistical Manual ("DSM-V") criteria had been met for Substance Use Disorder, Opioid Use Disorder and Sedative, Hypnotic and Anxiolytic Use Disorder.

14.     Upon Zachary's discharge from Caron Pennsylvania on February 11, 2019, his medical team reiterated his clinical diagnoses of Severe Opioid Use Disorder and Other Specified Trauma and Stressor Related Disorder and indicated that he was being discharged against medical advice.  His medical team noted that during his stay, there were multiple concerns about Zachary being under the influence and that he had behavioral issues including using inappropriate language with staff members and patients, damaging property and having non-substance contraband in his possession.  Due to his verbal aggression toward staff and peers, he was placed on a 72-hour discharge notice.  Because he violated the terms of the discharge notice, he was asked to transfer to another facility, but instead he left treatment against medical advice.  Lastly, the medical team noted that Zachary was at a high risk of relapse due to his drug of choice (heroin).

15.     After leaving Caron Pennsylvania on February 11, 2019, and with the encouragement of his family, Zachary agreed to continue his treatment as recommended by his medical team at Caron Pennsylvania.  He entered Boca Detox facility on February 12, 2019 and remained there until February 17, 2019.  On February 18, 2019, Zachary was transferred directly from Boca Detox to Caron Florida, where he received inpatient residential substance-abuse treatment for the next four months.  Upon admission, this facility performed its own assessment of him and determined that he met the criteria for Severe Opioid Use Disorder, Severe Alcohol Use Disorder, Moderate Cocaine Use Disorder, Severe Cannabis Use Disorder, Generalized Anxiety Disorder and Major Depressive Disorder.  Zachary's medical team at this facility concluded that he required "day/night treatment with community living" level of care.  This level of care was a residential inpatient

7

service necessary for patients who had failed to make progress at less intense levels of care; had stable medical or psychiatric problems that required close monitoring; and had impairment of social, familial, or occupational functioning requiring separation from the environment.

16. At the time of admission to Caron Florida, Zachary's medical team noted his substance abuse issues, anger issues, family strain and trauma. The admission report noted Zachary's ongoing struggles with remaining sober and his repeated failed attempts at treatment as discussed above. In addition, his medical team reported that Zachary had been involved in a domestic violence incident the previous June in which an ex-girlfriend had accused him of choking her while he was under the influence. Zachary was arrested and spent a night in jail before the ex-girlfriend recanted her story and the charges were dropped. The report also explained that Zachary had experienced tremors, diarrhea, blackouts, itchy skin, excessive sweating, memory lapse, anxiety and depression while under the influence. The medical team also reiterated that Zachary remained at a high risk for relapse.

17. After approximately four months of residential inpatient treatment, Zachary was discharged from Caron Florida on June 25, 2019. Upon discharge, his medical team noted that Zachary had made steady progress in his recovery, he was in the contemplative stage of change and it was recommended that he continue with intensive outpatient level of care to serve his need for ongoing support that would assist in continuing his recovery.

18. Unfortunately, as noted above, Zachary was unable to continuously maintain his sobriety, and he spent the next seven months moving around to different halfway houses and detoxification centers in Florida. During this time his family struggled to stay in touch with him, support him and get him the help he needed. Sadly, this pattern continued until Zachary suffered his January 29, 2020 life-threatening overdose. Following his overdose, Zachary received further

inpatient residential substance-abuse treatment at Voyage Recovery, where he remained for three months. Thankfully, Zachary's treatment at Voyage Recovery was successful and he was finally able to remain sober.

19. As clearly evidenced by Zachary's current sobriety and the information contained in his medical records, all his substance-abuse treatment was medically necessary, was an eligible health service under the Plan and should have been fully covered. However, Aetna wrongly and in contravention of the Plan terms failed to pay many of Zachary's valid health benefit claims. As a result, Plaintiffs Clayton Wallace and Liza Wallace were forced to pay nearly $200,000 in medical expenses related to Zachary's care that should have been covered under the Plan and paid by Defendants. Because of Plaintiffs Clayton Wallace and Liza Wallace's out-of-pocket payments, there are no outstanding medical costs owed to providers related to Zachary's treatment.

20. From December 2018 through May 2020, the only coverage determination letter that Plaintiffs received from Aetna relating to Zachary's treatment was a letter dated April 18, 2019, in which Aetna denied coverage for residential substance-abuse treatment **for the period of January 28, 2019 through February 9, 2019**. The basis of the denial was that:

> Coverage for the requested services has been denied because we have not been able to obtain any requested clinical information from the provider to determine whether or not the services are considered medically necessary under the terms of the plan.

Aside from this letter, *Aetna did not provide Plaintiffs with any other denial letters relating to Zachary's ongoing treatment*. Thus, the only claims subject to Aetna's April 18, 2019 written denial letter were those related to Caron Pennsylvania, where Zachary received inpatient residential treatment from January 28, 2019 through

9

1  February 11, 2019.  All other claims related to Zachary's substance-abuse treatment, including claims related to his stays at Cirque Lodge, Caron Florida, Boca Detox, Legacy Healing Detox Center, Immersion Residential and Voyage Recovery, were ***not*** covered by the written denial letter.

21. On May 11, 2020, Plaintiffs' prior authorized representative, the Van Law Firm, sent a letter to Aetna, appealing the denial of Zachary's medical benefit claims from December 2018 forward.  Plaintiffs explained that Zachary had continued to undergo medically necessary substance-abuse treatment throughout this time and requested that Aetna cover all related costs in compliance with the Plan.  Plaintiffs also informed Aetna that, because the Caron residential treatment facilities were out-of-network, all treatment should have been covered at least at the 60% rate or higher with no deductible applied.  Plaintiffs further explained that, because no formal denial letters had been received for any services other than those in the 13-day period of January 28, 2019 through February 9, 2019, the 180-day window to appeal all other claims had not expired (and in fact had not yet started) and, accordingly, Aetna should proceed with its review of those claims.  Lastly, Plaintiffs requested a detailed breakdown of what claims were covered, what claims were not covered, at what rates the covered claims were paid and any reasoning for denying the claims.

22. On May 21, 2020, Aetna sent the Van Law Firm a letter in response to the May 11, 2020 appeal request.  Aetna's letter incorrectly claimed that the appeal was related to services rendered on January 28, 2019 through June 24, 2019 by Caron Renaissance.  However, as discussed above, Plaintiffs' appeal letter clearly stated that it related to all claims concerning Zachary's substance abuse treatment for the period of December 2018 onward.  Plaintiffs' appeal letter also explained that no adverse benefit determination had been received other than the April 18, 2019 denial letter covering the period January 28, 2019 through February 9, 2019 and that, therefore, the appeal of all other claims was timely.  Despite these

statements, Aetna's May 21, 2020 letter claimed (incorrectly) that the appeal was untimely because it had not been received within 180 days from the date of the original notice of an adverse benefit decision and that, therefore, Aetna would not be conducting a review of the appeal.

23. On July 19, 2020, Plaintiffs, through their former authorized representative, the Van Law Firm, responded to Aetna's May 21, 2020 letter. Plaintiffs again reminded Aetna that no adverse benefit determination had ever been received for Zachary's health benefit claims (as discussed above) and, thus, the 180-day appeal clock had not started and the appeal was timely. Plaintiffs again requested that Aetna consider their appeal. In addition, because Aetna had wrongly labeled their appeal as pertaining to claims in 2019 only, Plaintiffs submitted another appeal letter dated July 19, 2020 specifically addressing claims incurred beginning January 2020. Plaintiffs' second appeal letter reiterated the arguments made in the first appeal letter regarding the medical necessity of Zachary's substance-abuse treatment and requested that Aetna cover the unpaid medical costs to the fullest extent permitted under the Plan.

24. By letter dated July 30, 2020, Aetna repeated its inaccurate assertion that Plaintiffs' appeal of claims pertaining to services incurred through June 24, 2019 was untimely. Aetna's letter stated that the appeal process had been exhausted with respect to these claims and that it would not respond to any further requests for review. Aetna's letter also failed to address any of Zachary's 2020 claims even though it was aware that Plaintiffs were disputing those claims as well. Aetna's refusal to hear Plaintiffs' appeal regarding these claims was highly improper because it knew, or should have known, that no adverse benefit determination notices were ever sent to Plaintiffs (other than the April 18, 2019 denial letter), that Plaintiffs' appeal was timely and that, as a result of Aetna's refusal to hear the appeal, Plaintiffs were given no opportunity to respond to Aetna's claims denials at the administrative level.

11

25. Subsequently, throughout August of 2020, Aetna sent Plaintiffs a series of letters relating to Zachary's substance-abuse treatment received between January 22 and June 9, 2020. The letters indicated that they were in response to Plaintiffs' appeal of certain claim determinations for services provided between those dates. It is unclear whether the August 2020 letters were sent in response to Plaintiffs' second appeal letter. The letters informed Plaintiffs that Aetna was upholding its prior benefit determinations. Although these letters purported to address Zachary's appeal of health insurance claims for the period January 22 to June 9, 2020, these letters failed to provide Plaintiffs with a reasonable opportunity for a full and fair review of Zachary's claims because Plaintiffs had never received the original adverse benefit determination in the first place and, thus, they were unable to properly address the basis for the claim denials. In addition, many of the August 2020 letters were vague and cursory and failed to provide the specific reasons for the adverse benefit determination.

26. As a result of Aetna's improper and entirely inadequate claims-handling process, Plaintiffs were forced to retain current counsel to pursue their wrongly denied health benefits. By letters dated October 29, 2020, December 2, 2020, January 5, 2021, January 19, 2021 and February 10, 2021, Plaintiffs' counsel requested a copy of all documents relevant to Zachary's disputed health insurance claims from Aetna pursuant to Section 503 of ERISA, 29 U.S.C. Section 1133, and applicable Department of Labor Regulations, including 29 C.F.R. Section 2560.503-1(h)(2)(iii). Despite Plaintiffs' repeated requests for documents, Aetna failed to provide the necessary documentation to Plaintiffs. Instead, Aetna repeatedly referred Plaintiffs' counsel's letters to the Rawlings Company (which handles Aetna's subrogation claims), even after Plaintiffs informed Aetna that their request for documents did not relate to a subrogation matter and should be handled directly by Aetna. To date, Plaintiffs have received no substantive response from Aetna to their request for claim documents.

27. As evidenced by the aforementioned conduct, throughout the entire administrative phase, Aetna engaged in an arbitrary and capricious handling of Plaintiffs' file, in violation of its obligations under ERISA. Plaintiffs are now and at all times relevant were entitled to payment of health insurance benefits under the Plan for Zachary's medically necessary substance abuse treatment.

28. Under California Insurance Code Section 10110.6 (which applies to health plans) and because of Aetna's blatant violation of ERISA's full and fair review regulations by failing to "set[] forth the specific reasons for [a] denial, written in a manner calculated to be understood by the participant," pursuant to 29 U.S.C. Section 1133(1), with respect to Plaintiffs' claims and Aetna's denials of the claims, a de novo standard of review applies. *See Khani v. Regence BlueShield*, 2011 U.S. Dist. LEXIS 106850 21-22 (W.D. Wash. 2011) ("Under ERISA, plan administrators must follow certain practices when processing and deciding plan participants' claims. According to ERISA's procedural requirements, claims procedures must 'contain administrative processes and safeguards to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents.' 29 C.F.R. § 2560.503-1(b)(5). In addition, an administrator must provide a plan participant with adequate notice of the reasons for denial 'setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant,' 29 U.S.C. § 1133(1), and must provide a 'full and fair review' of the participant's claim, id. § 1133(2)."). In *Abatie v. Alta Health & Life Ins. Co*., 458F. 3d 955, 971 (9th Cir. 2006), the Ninth Circuit specifically held that "[w]hen an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well, we review de novo the administrator's decision to deny benefits."

29. Plaintiffs exhausted their administrative remedies under the Plan and have the right to bring a legal action for benefits under ERISA Section 502(a), based

on the fact that Aetna failed to follow claims-handling procedures consistent with the requirements of ERISA. Specifically, as detailed above, Aetna failed to provide Plaintiffs with written notice stating the specific reasons for the denial of the claims and failed to afford Plaintiffs a reasonable opportunity for a full and fair review of those claims. *See* 29 C.F.R. Section 2560.503-1(l)(1).

## FIRST CLAIM FOR RELIEF

To Recover Benefits, Attorneys' Fees and Pre-Judgment Interest

under ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

(Plaintiffs against Defendants and Does 1 through 10)

30. Plaintiffs incorporate each and every paragraph alleged above as though fully set forth herein.

31. ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits plan participants and beneficiaries like Plaintiffs to bring a civil action to recover benefits due to them under the terms of a plan, to enforce their rights under the terms of a plan and/or to clarify their rights to future benefits under the terms of a plan.

32. At all times relevant, Plaintiffs have been entitled to benefits under the Plan. Plaintiffs have been and continue to be entitled to full payment, pursuant to the terms of the Plan, of their valid health-insurance claims arising out of Zachary's medical treatment. By denying Plaintiffs' claims for benefits under the Plan, and by related acts and omissions, Defendants violated, and continue to violate, the Plan terms and Plaintiffs' rights thereunder.

33. Defendants have failed to follow even the most rudimentary claims-processing requirements of ERISA and of the Department of Labor Regulations and have failed to conduct a "full and fair review" of the claim denials, as required by 29 U.S.C. Section 1133(2). Thus, even if the Plan vests discretion in Defendants to make benefit determinations, no deference is warranted with regard to Defendants' handling of this claim. *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d

14

1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

34. A "prudent person" standard is imposed on ERISA fiduciaries. *See* 29 U.S.C. Section 1104(a)(1)(b). A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan. *See* 29 U.S.C. Section 1104(a)(1). Under ERISA: (1) a fiduciary must discharge its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the plan, on behalf of a party whose interests are adverse to the interests of the plan, its participants or its beneficiaries. Defendants' handling of Plaintiffs' benefit claims falls far short of these standards.

35. For all of the reasons set forth above, the decision to deny benefits was arbitrary, capricious, wrongful, unreasonable, irrational, incorrect, contrary to the evidence, contrary to the terms of the Plan and contrary to law. Defendants abused their discretion in deciding to deny these claims, as the evidence shows its denial decision to be arbitrary and capricious. Further, Defendants' denial decision and related actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008). Defendants' denial of Plaintiffs' claims was incorrect and improper and constituted an abuse of discretion, as evidenced by the aforementioned conduct.

36. As a direct and proximate result of Defendants' erroneous denial of Plaintiffs' claims for health benefits, Plaintiffs have been deprived of these benefits from December 2018 to the present and have incurred almost $200,000 in unreimbursed medical expenses that should have been covered under the Plan.

15

37. As a direct and proximate result of the denial of benefits, Plaintiffs have been required to incur attorneys' fees to pursue this action, and are entitled to reimbursement of these fees pursuant to 29 U.S.C. Section 1132(g)(1).

38. A controversy now exists between the parties as to whether Plaintiffs are entitled to health benefits under the Plan. Plaintiffs seek a declaration from this Court that Zachary's unpaid medical treatment is a covered benefit under the Plan and that Plaintiffs are therefore entitled to such benefits under the Plan. In the alternative, Plaintiffs seek a remand to the claims administrator for a determination of their claims that is consistent with the terms of the Plan and applicable case law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief against all defendants:

1. For all Plan benefits due and owing to Plaintiffs.
2. For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g).
3. For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred. *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992). Specifically, Plaintiffs seek interest at the rate of 10% per annum, pursuant to California Insurance Code Section 10111.2.

///
///

4. For such other and further relief as this Court deems just and proper.

Dated: May 21, 2021          **McKENNON LAW GROUP PC**

By: _____
ROBERT J. McKENNON
ANDREA SOLIZ
Attorneys for Plaintiffs, Zachary Wallace, Clayton Wallace and Liza Wallace